<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **DAVID KUNION** | : |
| | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : |
| | : |
| **METROPOLITAN LIFE INSURANCE** | : |
| **COMPANY and INTERNATIONAL** | : |
| **BUSINESS MACHINES** | : |
| **CORPORATION DISABILITY PLAN,** | : |
| | : |
| **Defendants.** | : |
| | : |

Civil Action No. 12-3675 (ES)(JAD)


<u>OPINION</u>

<u>SALAS, District Judge</u>

### I.      Introduction

This matter comes before the Court on Defendants, The Metropolitan Life Insurance Company ("MetLife") and the IBM Long-Term Disability Plan's[1] ("Plan"), (collectively, the "Defendants"), motion for summary judgment.  (D.E. No. 23).  The Court has considered the parties' submissions in support of and in opposition to the instant motion, and decides the matter without oral argument pursuant to Fed. R. Civ. P. 78(b).  For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

### II.     Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*

---

[1] Defendant was pled as "International Business Machines Corporation Disability Plan" but identifies itself as "IBM Long-Term Disability Plan."

III.     **Factual Background and Procedural History**[2]

   **A.  The IBM Long-Term Disability Plan and Policy**

Plaintiff David Kunion seeks continued payment of his long-term disability ("LTD")
benefits under the terms of the Plan, which was maintained by IBM to provide LTD benefits to
its employees and which was funded by a group policy issued by MetLife.  (SUMF ¶¶ 1-2; D.E.
No. 1, Compl.).  Pursuant to the plan, MetLife is the claims fiduciary responsible solely for "full
and fair review of claims denials," and who "shall have discretionary authority to interpret the
terms of the LTD Plan and to determine eligibility for and entitlement to LTD Plan benefits."
(SUMF ¶ 3).  The Plan further provides that "[a]ny interpretation or determination made
pursuant to such discretionary authority shall be given full force and effect, unless it can be
shown that the interpretation or determination was arbitrary and capricious."  (*Id.*).

The Plan also provides, in pertinent part, as follows:

   **Disabled** or **Disability** means that, due to Sickness or as a direct
   result accidental injury:

   - You are receiving Appropriate Care and Treatment and
     complying with the requirements of such treatment; and

   - You are, during the Elimination Period and the next 12
     months of Sickness or accidental injury unable to perform
     each of the material duties of Your Own Job; and

---

[2] The facts recited here are, unless otherwise indicated, undisputed. (*Compare* D.E. No. 23-1,
Statement of Undisputed Material Facts ("SUMF"), *with* D.E. No. 26, Pl. David Kunion's
Response in Opp. to Defs.' Statement of Undisputed Material Facts ("Pl. Response to SUMF")).
This Court further notes that Plaintiff admitted the majority of facts in response to Defendants'
Statement of Undisputed Material Facts, and did not submit his own statement of disputed facts.
The Court thus cites to Defendants' Statement of Undisputed Material Facts, unless the specific
paragraph is disputed and material.  The Court also does not cite to the underlying administrative
record upon which the parties rely.

- 2 -

- You are, after such period unable to perform the duties of any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.

****

**Proof** means Written evidence satisfactory to Us that a person has satisfied the conditions and requirements for any benefit described in this certificate.   When a claim is made for any benefit described in this certificate, Proof must establish:

- the nature and extent of the loss or condition;
- Our obligation to pay the claim; and
- the claimant's right to receive payment.

Proof must be provided at the claimant's expense.

****

**We**, **Us** and **Our**  mean MetLife.

****

**You** and **Your**  mean an employee who is insured under the Group Policy for the insurance described in this certificate.

(*Id.* ¶ 4).  Additionally, the Plan provides:

### DISABILITY   INCOME   INSURANCE:   LONG   TERM BENEFITS

If You become Disabled while insured, Proof of Disability must be sent to Us.  When We receive such Proof, We will review the claim.  If We approve the claim, We will pay the Monthly Benefit up to the Maximum Benefit Period shown in the SCHEDULE OF BENEFITS, subject to THE DATE BENEFIT PAYMENTS END section.

(*Id.* ¶ 5).  For disabilities due to mental or nervous disorders or diseases, the Plan

provides:

- 3 -

> If You are Disabled due to a Mental or Nervous Disorder or Disease, We will limit Your Disability benefits to a lifetime maximum equal to the lesser of:
>
> - 24 months; or
> - the Maximum Benefit Period.
>
> This limitation will not apply to a Disability resulting from:
>
> - schizophrenia;
> - dementia; or
> - organic brain disease.
>
> **Mental or Nervous Disorder or Disease** means a medical condition which meets the diagnostic criteria set forth in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders as of the date of Your Disability. A condition may be classified as a Mental or Nervous Disorder or Disease regardless of its cause.

(*Id.* ¶ 6).

### B.  Pre-Initial Determination of April 19, 2011

Plaintiff became disabled as a result of his inability to concentrate under excessive stress, and hence stopped working on February 5, 2008.  (*Id.* ¶ 7).  He received short-term disability benefits for the maximum period between February 5, 2008, and August 5, 2008.  (*Id.* ¶ 8). Thereafter, Plaintiff applied to MetLife for LTD benefits under the Plan, which application was supported by an Attending Physician Statement ("APS") from his treating psychologist, Stephen S. Craig, Ph.D., who described his diagnoses as "Major Depressive Disorder" and "Acute Reaction to Stress."  (*Id.* ¶¶ 9-10).  By letter dated August 5, 2008, MetLife approved Plaintiff's LTD benefits and informed Plaintiff that his diagnoses fell within the mental or nervous disorder and that therefore, his benefits would be subject to a limited benefit period of 24 months, which was set to expire on August 4, 2010, unless one of three exceptions applied.  (*Id.* ¶ 11).

In March and June 2009, Dr. Craig updated MetLife with his diagnoses of "Major Depressive Disorder," "Generalized Anxiety Disorder," and "Acute Stress Disorder." (*Id.* at ¶¶ 13, 15). Plaintiff's psychiatrist, Ambrose Mgbako, M.D., also submitted a letter, indicating that Plaintiff "suffers from severe persistent bipolar disorder, hypo manic type which disables him from all occupations." (*Id.* ¶ 14).

By letter dated July 7, 2009, MetLife informed Plaintiff that it would continue Plaintiff's LTD benefits based on "total disability from any occupation," and reiterated that Plaintiff's primary diagnosis fell within the definition of mental or nervous disorder and was subject to a 24-month benefit period. (*Id.* ¶ 16). Thereafter, by letter dated February 1, 2010, David G. Miller, M.D. submitted a letter to MetLife. (*Id.* ¶ 17). Dr. Miller explained that Plaintiff "suffer[ed] from a significant Depressive Disorder with Anxiety," and stated that Dr. Mgbako had diagnosed Plaintiff with "Bipolar Disorder" and that a neurologist, Dr. Marvin Ruderman, "had performed a neurologic evaluation and MRI scan which revealed no focal abnormality." (*Id.*). By letter dated March 29, 2010, Thomas Lane, LCSW, notified MetLife that Plaintiff had been attending an Intensive Outpatient Program three days a week since March 8, 2010, with a diagnoses of "Bipolar Disorder" and "Anxiety Disorder." (*Id.* ¶ 18).

Plaintiff also submitted medical records to establish an LTD benefits claim based on his degenerative disc disease and spinal stenosis. Specifically, Scott D. Orenberg, D.O. submitted a letter dated January 31, 2010, in which he reported that lumber spine x-ray revealed narrowing of disc space at the L4-L5 level, that a lower extremity EMG was "suggestive of lumbosacral radiculopathy and spinal stenosis L5-S1 and S1-S2 bilaterally," and that Plaintiff was referred for physical therapy three times a week for one month. (*Id.* ¶ 19). MetLife acknowledged receipt by letter dated March 23, 2010, but noted that "physical exam findings and specific medically

supported restrictions and limitations were not provided." (*Id.* ¶ 20).

In March and April 2010, Kenneth J. Rieger, M.D. also reported that Plaintiff's imaging studies and MRI indicated "severe degenerative disc disease at L4-L5 with moderate foraminal stenosis at L4-L5, as well as, L5-S1," and diagnosed Plaintiff with "Spinal Stenosis/Degenerative Disc Disease." (*Id.* at ¶¶ 21, 23). Matthew Lipp, M.D. also reported that an MRI showed that Plaintiff had "significant degenerative bulging and stenosis at the L5-S1 level" and recommended that Plaintiff "undergo a right a L5-S1 transforaminal epidural steroid injection," which was scheduled but aborted due to a change in heart rate. (*Id.* at ¶¶ 22, 24). By letter dated June 8, 2010, MetLife informed Plaintiff that his 24-month maximum benefit period due to his disabling mental condition was set to expire on August 4, 2010, but that his LTD benefits would continue beyond this date due to "another disabling medical condition." (*Id.* ¶ 25).

In response to MetLife's request for additional medical information, in October 2010, Dr. Craig submitted a fax with diagnoses of "Bipolar I Disorder," "Generalized Anxiety Disorder," and "Acute Stress Disorder." (*Id.* ¶ 27). On November 3, 2010, Dr. Craig submitted an APS stating a primary diagnosis of "Acute Stress Disorder" and a secondary diagnoses of "Major Dep. Disorder," "Alteration of Consciousness," and "Bipolar Disorder." (*Id.* ¶ 28). On November 12, 2010, Dr. Miller submitted a form questionnaire in which he diagnosed Plaintiff with "Dementia" and "Mood Disorder," but provided no support for the dementia diagnosis.[3] (*Id.* ¶ 29). On October 25, 2010, MetLife also received an APS from an orthopedist, Kenneth J.

---

[3] Plaintiff admits that his diagnosis was dementia, but states that MetLife did not request documentation to support this diagnosis in the form questionnaire. In doing so, Plaintiff merely cites to the form questionnaire and does not provide any evidence to suggest that Dr. Miller supplemented this form. (Pl. Response to SUMF ¶ 29).

Kopacz, M.D., who diagnosed Plaintiff with "Spinal Stenosis – Lumber 4-5" and "Lumbar Radiculopathy." (*Id.* ¶ 30).

MetLife retained Elite Physicians Limited ("EPL") to review Plaintiff's entire file. (*Id.* ¶ 31). EPL obtained an independent review by a specialist in clinical and forensic neuropsychologist, Michael J. Perrotti, Ph.D. (*Id.*). In his report and opinion dated January 17, 2011, Dr. Perrotti stated that there was no psychological testing to support a diagnosis of dementia and after reviewing the tests conducted by Dr. Craig, Dr. Perrotti concluded that those results were inconsistent with a diagnosis of dementia. (*Id.* ¶¶ 31-33). On March 30, 2011, Dr. Craig provided an APS that stated diagnoses of "Dementia, . . . Bipolar Disorder, . . . Alteration of Consciousness, . . . [and] Acute Stress Disorder," but provided no support for the dementia diagnosis nor reason for the change from the previous diagnosis. (*Id.* ¶ 37).

Dr. Kopacz also submitted an office note and APS, which diagnosed Plaintiff with "Lumbar Disc Degeneration" and stated that Plaintiff could "obviously work in a sedentary-type position" with the ability to get up every hour or so to "get up out of his chair." (*Id.* ¶¶ 34-35). Dr. Kopacz submitted another APS on April 5, 2011, in which he repeated the diagnosis and stated that Plaintiff could "return to work on April 20 with restrictions" for eight hours per day with intermittent breaks to stand and walk. (*Id.* ¶ 38).

In March 2011, MetLife also sought an Employability Assessment and Labor Market Analysis. (*Id.* ¶ 36). The vocational consultant concluded that Plaintiff had "the ability to work at the [s]edentary level of physical exertion with restrictions and limitations" and "identified 3 occupations" for which Plaintiff was qualified in his geographical area. (*Id.* ¶ 36).

On April 19, 2011, MetLife notified Plaintiff that payment of his LTD benefits would be terminated on May 19, 201, based on the entire review of the administrative record. (*Id.* ¶ 39).

The letter noted that Plaintiff was no longer disabled due to degenerative disc disease or spinal stenosis, that his own doctors had found that he could return to "full-time sedentary demand work with restrictions," and that a labor market analysis had concluded that occupations existed for which Plaintiff was qualified in his geographic area. (*Id.*). MetLife further acknowledged Plaintiff's psychiatric functional limitations; that Dr. Perrotti determined that that there was no support for the diagnosis of dementia; and thus that Plaintiff did not qualify for an exclusion from the 24-month maximum benefit period. (*Id.*).

### C. Administrative Appeal and Subsequent Submissions

On May 4, 2011, MetLife received an APS from Sam Locatelli, M.D., which diagnosed Plaintiff with "Lumbar radiculitis." (*Id.* ¶ 40). Dr. Locatelli also stated that his office did not advise Plaintiff to stop working and that an opinion on why Plaintiff was unable to perform job duties was "not related to [Dr. Locatelli's] therapy." (*Id.*). Accordingly, by letter dated May 9, 2011, MetLife acknowledged receipt of additional medical records and informed Plaintiff that he should follow appeals procedures outlined in the April 19, 2011 termination letter. (*Id.* ¶ 41).

In May 2011, Plaintiff and his attorney sought an administrative appeal of MetLife's determination. (*Id.* ¶¶ 42-45). By letter dated October 29, 2011, Plaintiff's counsel submitted additional medical documentation for MetLife's consideration without further explanation. (*Id.* ¶ 46). In an office note dated June 3, 2011, Dr. Rieger stated that Plaintiff had "progressive disability due to his spinal stenosis and lower extremity pain," would require an "L4-S1 laminectomy . . . when he is ready," and could work 20 hours per week from home. (*Id.*). In Dr. Rieger's APS dated April 12, 2010, he repeated his diagnosis of spinal stenosis and degenerative disc disease. (*Id.*). In a report dated June 9, 2011, Dr. Miller stated that Plaintiff was "dramatically limited by his cognitive deterioration," that "there was no evidence of significant

depression nor anxiety," and that Plaintiff should remain "disabled from any job which would require significant concentration, attention, or cognitive functioning." (*Id.*).

Further, Plaintiff's counsel also submitted a report from Dr. Craig dated June 17, 2011 in which he concluded that Plaintiff "remains fully and completely disabled from any and all job functions that would require even a minimal level of concentration, attention, or cognitive function." (*Id.*). A report from Saint Barnabas Imaging Center dated March 3, 2010 was also submitted, which showed "[d]egenerative disc disease most pronounced at the L4-L5 level without significant interval change." (*Id.*). In a report dated May 17, 2011, Dr. Kopacz also stated that Plaintiff "may return to work as long as he is restricted to a sedentary position with the ability to stand or move positions every hour" and that Plaintiff could "work 20 hours at home during the week and 20 hours in the office per week." (*Id.*). Finally, Plaintiff's counsel submitted two office notes from Warren J. Bleiwess, M.D. dated December 7, 2010, and September 20, 2011, in which he noted that Plaintiff had been treated with trigger point injections and that Plaintiff's "condition interferes with his ability to function and perform work activities." (*Id.*).

Following receipt of this medical documentation, MetLife obtained a second independent review of Plaintiff's entire file by a different neuropsychologist, Keven Anne Murphy, Ph.D. (*Id.* ¶ 47). In her report and opinion dated November 19, 2011, Dr. Murphy stated that she reviewed Plaintiff's extensive medical records and that she agreed with Dr. Perrotti's opinion that "the results of psychological testing were more consistent with a psychiatric disorder than a neurological disorder, such as dementia or organic brain disease." (*Id.*). Dr. Murphy further stated that Plaintiff's own doctors had not referred Plaintiff "to a neurologist or for a neuropsychological assessment" and that the testing performed by Dr. Craig "did not constitute a

- 9 -

neuropsychological evaluation and was of limited usefulness in the diagnosis of a dementia or other organic brain disease." (*Id.*). Dr. Murphy also noted that if Plaintiff's condition "was thought to have an organic basis," it would be expected that Plaintiff would have been referred back to Dr. Ruderman who referred Plaintiff initially to Dr. Craig or to another neurologist. (*Id.*). Finally, in response to an inquiry as to why the medical evidence does not support the diagnosis of dementia, Dr. Murphy explained that "there was no significant decline in overall intellectual functioning between" the two intelligence tests administered in 2008 and 2010, and therefore the "variability in areas of improvement and decline was more consistent with a psychiatric disorder than a progressive neurological disorder." (*Id.* ¶ 48).

Sometime after Dr. Murphy's November 2011 report was issued, Dr. Murphy spoke with Dr. Craig. (*Id.* ¶ 49). On December 7, 2011, Dr. Murphy issued an addendum report in which she stated that Dr. Craig informed her that he was still treating Plaintiff and that Dr. Murphy had received a call from Plaintiff. (*Id.*). Plaintiff informed Dr. Murphy that he was under the care and treatment of a new psychiatrist, Nirmal Sathaye, M.D.,[4] who wanted to "work on one thing at a time" and the "first step would be to get [Plaintiff's] anxiety under control." (*Id.*). Plaintiff also told Dr. Murphy that he was "most bothered by his memory and anxiety" and "his back was also bad." (*Id.*). Dr. Murphy concluded that Plaintiff was "receiving appropriate care and treatment for his psychiatric disorder," and that Dr. Sathaye's plan appeared to be the "appropriate course of action," but that the evidence supported that Plaintiff's issues were "psychiatric and not neurologic." (*Id.* ¶ 50). As such, Dr. Murphy maintained her conclusions stated in her initial opinion. (*Id.*).

At MetLife's request, Dana B. Mirkin, a Board certified doctor in occupational medicine,

---

[4] Dr. Murphy refers to Dr. Sathaye as "Dr. Satay" in her report. (*Id.*).

on behalf of Reliable Review Services ("RRS"), also conducted an independent medical review of Plaintiff's back problems.  (*Id.* ¶ 51).  Dr. Mirkin issued a report dated November 28, 2011, in which he concluded that Plaintiff had some physical limitations, but that he was "physically able to resume his normal sedentary occupation."  (*Id.*).

Thereafter, MetLife also sent Dr. Murphy and Dr. Mirkin's reviews and reports to Plaintiff's medical providers and counsel, requesting their comments.  (*Id.* ¶ 52).   MetLife claims that it did not receive any comments from Plaintiff's providers.[5]  (*Id.* ¶ 53).

By letter dated January 3, 2012, MetLife issued its determination upon review of Plaintiff's complete administrative claim file and concluded that the "medical information did not support that [Plaintiff] had any evidence of the exclusionary diagnoses for his mental or nervous disorder or disease limited benefit conditions" nor was Plaintiff "disabled as defined by the Plan regarding his physical conditions."  (*Id.* ¶ 55).   Therefore, MetLife upheld its initial determination.  (*Id.*).   The letter also advised Plaintiff that he had exhausted his administrative remedies and had the right to bring a lawsuit under ERISA.  (*Id.* ¶ 56).

On June 18, 2012, Plaintiff filed a complaint, alleging one count for wrongful denial of disability benefits against Defendants under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), ("Count One").  (Compl. ¶¶ 6-16).

Defendants' motion for summary judgment is now ripe for this Court's adjudication.

---

[5] Plaintiff claims that he does not have sufficient information to admit or deny this statement, but does not raise a genuine issue of material fact.  (Pl. Response to SUMF ¶ 53).

## IV.    Legal Standards

### A.  Summary Judgment Standard

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial.  *Id.* at 324.  In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  Thus, the non-moving party may not rest upon the mere allegations or denials in its pleadings.  *See Celotex Corp.,* 477 U.S. at 324.  Further, the non-moving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment.  *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999).  The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).  If the nonmoving party "fail[s] to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," then the moving party is entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 323.

### B.  ERISA Standard of Review

An ERISA benefits determination is reviewed under the de novo standard of review

- 12 -

"unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Where the administrator is vested with discretionary authority, this Court applies a "deferential standard of review," limiting its analysis to whether the administrator abused its discretion.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008).  Here, it is uncontested that the plan confers broad discretion on MetLife as the claims administrator.  (Pl. Response to SUMF ¶ 3; Pl.'s Mem. of Law in Support of Pl.'s Mot. in Opp. of Defs.'s Mot. for Summ. J. ("Pl. Opp. Br.") at 15-16).[6]  Thus, the Third Circuit has described this deferential review as an arbitrary and capricious (or abuse of discretion) standard,[7] under which the district court may "overturn a decision of the plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Doroshow v. Hartford Life & Acc. Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009) (citation omitted).  In this regard, courts must defer to an administrator's findings of facts when they are supported by substantial evidence, which the Third Circuit has defined as relevant evidence that reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from that evidence.  *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012).

The Supreme Court has explained that when conducting a deferential review of a claims determination of an administrator vested with discretionary authority, the reviewing court must consider whether the plan administrator operated under a conflict of interest.  *Glenn*, 554 U.S. at

---

[6] Because Plaintiff filed his opposition papers as one ECF filing without page numbers for each document, this Court refers to the ECF page number for citation purposes.  (*See* D.E. No. 26).

[7] The Third Circuit has noted that in the ERISA context, the "arbitrary and capricious standard" and "abuse of discretion standard" are "practically identical."  *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 526 n.2 (3d Cir. 2009).

108. The *Glenn* Court found that a conflict of interest may exist when the "plan administrator both evaluates claims for benefits and pays benefits claims." *Id.* at 112. As such, the Third Circuit has applied *Glenn* by requiring that courts "apply a deferential standard of review across the board" and "consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." *Estate of Schwing*, 562 F.3d at 525. The Court declined to adopt a bright-line rule on this conflict because "[b]enefit decisions arise in too many contexts, concern too many circumstances, and can relate in too many different ways to conflicts—which themselves vary in kind and in degree of seriousness—for us to come up with a one-size-fits-all procedural system that is likely to promote fair and accurate review." *Glenn*, 554 U.S. at 116-17.

      With this framework in mind, this Court will now turn to whether MetLife's claim determination was an abuse of discretion under the plan.

## V.    Analysis

### A.    MetLife's Purported Conflict of Interest

      As an initial matter, Plaintiff argues that this Court "should consider a possible conflict of interest" because MetLife operated both as the claims administrator and the payor of benefits. (Pl. Opp. Br. at 15-16). However, Plaintiff fails to submit evidence of significant conflict or bias, and has failed to raise a genuine issue of material fact. As the *Glenn* Court noted, some conflicts based on the specific facts in the record will be less significant "(perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." 554 U.S. at 117 (citation omitted). This Court

- 14 -

finds that the evidence in the record demonstrates that MetLife has taken steps to reduce any potential bias by keeping finances separate from claims and by not providing any incentive to deny claims. (D.E. No. 23-2, Br. in Support of Mot. for Summ. J. ("Defs. Br.") at 21 (citing D.E. No. 23-3, Cert. of Laura Sullivan ¶¶ 4-6)). Thus, while the Court observes MetLife's dual role, it finds no evidence to confer special emphasis on this factor.

### B.   MetLife's Determination Was Based On Substantial Evidence

MetLife argues that its adverse benefit determination was reasonable and based on abundant evidence and therefore should be upheld. (Defs. Br. at 23). Specifically, it relies on the substantial evidence including independent medical exams, Plaintiff's own orthopedist that cleared him for work, the expiration of the 24-month maximum benefit for his psychiatric condition, and that there was no support for the conclusory diagnosis of dementia. (*Id.* at 27-29). Plaintiff disagrees, arguing that MetLife's decision was arbitrary and capricious, because he is unable to work and the decision was not based on substantial evidence. (Pl. Opp. Br. at 15-20).

This Court has thoroughly reviewed the administrative record, and now concludes that MetLife's claim determination was reasonable, because it is supported by substantial evidence and a reasonable person could accept the evidence as adequate to support the conclusion that Plaintiff was not disabled. Here, MetLife applied the express terms of the Plan and had discretionary authority to determine Plaintiff's eligibility for benefits. In August 2008, MetLife granted Plaintiff's claim for LTD benefits based on his diagnoses of Major Depressive Disorder and Acute Reaction to Stress, and informed Plaintiff that this benefit expired in 24 months unless one of three exclusions applied. Two years later, in August 2010, MetLife approved the continuation of LTD benefits because Plaintiff was also being treated for his severe back problems, subject to periodic updates on his disabling medical condition.

- 15 -

Thereafter, however, Plaintiff's own orthopedist cleared him to return to work on April 20, 2011.  MetLife also obtained a labor market analysis, which concluded that Plaintiff could work in a sedentary position and that three jobs existed in his geographical area.  Meanwhile, Plaintiff's psychiatrist, for the first time, diagnosed Plaintiff with dementia, but did not explain his diagnosis or submit any evidence to explain the change in diagnosis.  In fact, Plaintiff's neurologic evaluation performed by Dr. Ruderman had revealed "no focal abnormality." Consequently, MetLife sought an independent medical exam ("IME") by a doctor that specialized in neuropsychology.  In his report dated January 17, 2011, Dr. Perrotti concluded that there was no data to support a diagnosis of dementia.

Upon review of the entire claim file, including an independent review, a labor market analysis and reports from Plaintiff's own doctors that cleared him to return to work and did not support their changed diagnosis of dementia, MetLife informed Plaintiff that he was no longer disabled under the terms of the Plan and that his benefits would cease on May 19, 2011. Following Plaintiff's administrative appeal and submission of additional medical documentation, MetLife obtained a second IME by licensed psychologist Dr. Murphy.  Following a review of extensive medical records, Dr. Murphy issued two reports and agreed with Dr. Perrotti's conclusion that Plaintiff's mental disorder was "psychiatric not neurologic," and that there was no neurologic evidence to support the diagnosis of dementia.  Notably, Plaintiff's doctors diagnosed Plaintiff with dementia after the expiration of the 24-month benefit period in August 2010.  Dr. Miller first diagnosed Plaintiff with dementia in November 2010 and then Dr. Craig diagnosed dementia in March 2011.  Neither Dr. Miller nor Dr. Craig supported their medical conclusion with objective data and testing or offered an explanation for the new diagnosis.

- 16 -

MetLife also obtained an IME from Dr. Mirkin who concluded that Plaintiff could return to a sedentary occupation.

Thus, MetLife reviewed the entire administrative file and obtained two IMEs in making its determination.  This Court finds that MetLife did not abuse its discretion because its determination was based on substantial evidence. By relying on multiple independent medical evaluations, as well as Plaintiff's own doctor's reports, to ultimately conclude that Plaintiff was not disabled and was able to return to work, MetLife was not unreasonable.  This Court finds that there was adequate evidence that might cause a reasonable person to agree with the termination of LTD benefits.  Accordingly, this Court finds that no reasonable factfinder could find that MetLife's determination was arbitrary and capricious.

Plaintiff argues that his doctors have "remained steadfast that Plaintiff has dementia" since October 2010, and that in 2011, Dr. Kopacz opined that Plaintiff could only work 20 hours due to his back problems.  (Pl. Opp. Br. at 16, 18).  But, the Plan delegates to MetLife discretionary authority to resolve any conflicts between the doctors.  In light of MetLife's discretionary authority to determine Plaintiff's eligibility for benefits, MetLife also had discretion to resolve any factual disputes relating to his eligibility.  *Fleisher*, 679 F.3d at 122 (finding that a grant of discretionary authority to the claims administrator to apply the plan also "encompass[ed] the resolution of factual disputes") (citation and quotation marks omitted). MetLife's findings of fact were amply supported and explained by evidence in the record.  *See Abnathya v. Hoffman-LaRoche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993), *abrogated on other grounds by Glenn*, 554 U.S. at 112 (finding that abuse of discretion is determined not by evaluating whether the claim administrator's determination was correct, but rather by evaluating whether

the determination was reasonable and supported by the evidence).  As such, this Court's role is limited to determining whether it reasonably resolved the conflicts, which it did.

Plaintiff also claims that because MetLife's independent consultants only reviewed the claim file and did not examine and treat Plaintiff, MetLife's decision was arbitrary and capricious.  (Pl. Opp. Br. at 16-18).   Here, too, Plaintiff's argument is meritless.  MetLife was entitled to rely upon opinions of consulting doctors and not accord great weight to the treating physicians' opinions.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *see also Nichols v. Verizon Commc'ns, Inc.*, 78 F. App'x 209, 211-12 (3d Cir. 2003) (claims administrator could rely on opinions of consulting doctors); *McCann v. Unum Provident*, No. 11-3241, 2013 WL 1145422, at *15 (D.N.J. Mar. 18, 2013) (finding that "[b]oth the Third Circuit Court of Appeals and district courts therein have concluded that a plan administrator that enjoys discretionary authority to determine eligibility for benefits may (1) rely on the opinions of nontreating physicians and, (2) accord those opinions greater weight that the opinions of treating physicians").

Plaintiff insists that the "arguable issue is whether Plaintiff is able to work with [his] limitations." (Pl. Opp. Br. at 19).  But Plaintiff misses the point.  The issue here is not whether Plaintiff is not able to return to work and disabled, but rather whether MetLife's termination of LTD benefits was reasonable based on the evidence in the administrative record.  Where, as here, the administrative record contains substantial evidence that supports the determination, even with evidence to the contrary, this Court must uphold the determination.

**VI.     Conclusion**

For the foregoing reasons, this Court does not find MetLife operated under a conflict of interest in making the determination to terminate Plaintiff's LTD benefits, and the Court finds

that MetLife relied on substantial evidence in deciding to terminate Plaintiff's LTD benefits. Viewing these factors as a whole, the Court concludes that MetLife's decision was not arbitrary and capricious.  Accordingly, Defendants' motion for summary judgment is granted. An Order accompanies this Opinion.

_s/Esther Salas_____
**Esther Salas, U.S.D.J.**